(C.D. 2167)

Charles M. Schayer v. United States

United States Customs Court, Second Division

(Decided April 13, 1960)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill*, trial attorney), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Lawrence, Judge: In this case, two protests were consolidated for trial. The merchandise to which they relate consists of certain electronic feed controls for ore grinding machines.

The devices were classified by the collector of customs as instruments "for regulating speed, no jewels" and duty was imposed thereon at the rate of $2.25 each and 35 per centum ad valorem pursuant to the provisions of paragraph 368(a) of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 368(a)), as modified by the trade agreement with Switzerland, 90 Treas. Dec. 174, T.D. 53832.

At the trial of this case, plaintiff, referring to claims in his protest, stated, "We claim, primarily, that they [the importations] should be classified at 13¾%, under paragraph 353, as metal parts of articles having as an essential feature an electrical element or device."

Plaintiff further stated, "We also claim, at the same rate, under paragraph 372, as metal parts of machines, not specially provided for. By amendment to the protest, we make the additional alternative claim that the articles should be classified with duty at 15%, under paragraph 353, under the provision covering articles suitable for producing, rectifying, modifying, controlling or distributing electrical energy."

The pertinent text of the statutes involved is here set forth:

Paragraph 368 (a), as modified, *supra*:

\* \* \* any mechanism \* \* \* intended or suitable \* \* \* for regulating, indicating, or controlling the speed of arbors, drums, disks, or similar uses \* \* \*:

    Mechanisms, devices, or instruments intended or suitable for measuring the flowage of electricity, \* \* \*

    Time switches, \* \* \*

    \*      \*      \*      \*      \*      \*      \*

    Other \* \* \* valued each—

    \*      \*      \*      \*      \*      \*

    Over $10_____ $2.25 each and 35% ad val.

Paragraph 353 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739:

Articles having as an essential feature an electrical element or device \* \* \*:

    Batteries \* \* \*

    \*      \*      \*      \*      \*      \*      \*

    Other \* \* \* _____ 13¾% ad val.

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part \* \* \*_____ The same rate of duty as the articles of which they are parts

Paragraph 372 of said act (19 U.S.C. § 1001, par 372), as modified by the Torquay protocol, *supra*:

Machines, finished or unfinished, not specilly provided for:

    Calculating machines \* \* \*

    \*      \*      \*      \*      \*      \*      \*

    Other \* \* \* _____ 13¾% ad val.

Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any item 372 in this Part:

    Parts of sewing machines \* \* \*

    Other _____ The rate for the article of which they are parts

Paragraph 353 of said act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy * * *:

    Switches and switchgear * * *

      *        *        *        *        *        *        *

    Other articles * * *_____ 15% ad val.

Plaintiff's exhibits 1A, 1B, and 2 and defendant's exhibits A and C consisting of various documents will be referred to wherever deemed necessary in the course of this opinion.

Charles E. Donnelly, the only witness in the case, was called by the plaintiff. The following facts may be gathered from his testimony: He is the chief project engineer for Aerofall Mills, Ltd., located in Toronto, Canada. That concern supplies engineers to perform any engineering necessary when contracts are received from an American firm known as Aerofall Mills, Inc., which is independent of the Canadian firm. The American firm sells the imported product for grinding, crushing any ore-bearing rock, metallic and nonmetallic.

Donnelly was instrumental in preparing the specifications for the production of the two controls under consideration and saw them "in working order and functioning in the final mine site" at Uravan, Colo.

At this point, the witness produced a photograph received in evidence as exhibit 1A, depicting the item now before the court showing the front panel with the door open. He also produced a photograph received in evidence as exhibit 1B showing the back view of the panel in question.

Donnelly stated that the items before the court are electronic feed controls which function to maintain an Aerofall Mills system operating at its maximum efficiency.

Plaintiff's exhibit 2, a pamphlet identified as "Bulletin 55A" entitled "The Aerofall Mill," was received in evidence for the benefit of the court and as an aid to the witness in describing the operation of an Aerofall Mill system. Whereas said exhibit 2 does not illustrate the electronic feed controls in issue, it does provide a representation of the system that they control.

With reference to page 1 of plaintiff's exhibit 2, Donnelly proceeded to describe how an Aerofall Mill system operates—

Ore is fed into the Aerofall Mill which is a circular drum that revolves at a constant speed and is driven by a synchronous motor through a gear train, identified by number 1 on the diagram. Ore is lifted up in the mill and is ground and crushed inside the mill, due, in part, to the design of the mill liners, said liners being shown as figure 4 on page 2, and acting as a lifting bar and a crushing bar. The ore is lifted up and tumbled upon itself while the drum is

revolving and this crushing action reduces large pieces of ore to a very fine product which is exhausted through the system by a controlled air stream. The ore in fine dust form is conveyed through the conveying duct (number 3). The ore in the air stream is conveyed to the first group of separators (number 4—baffle separator). At this point, the product carried in the air stream is mechanically separated by the action of the baffle separator, and the product is discharged through an air seal. The air still remaining in the system is conveyed by other air ducts to a second set of separators where the finer product is removed from the air system and discharged, said secondary separators being identified as number 5. The fan which circulates this air is illustrated as number 6. Said fan draws the air through the system.

Number 7 on page 1 of exhibit 2 is a bleed-off duct which takes 10 to 20 per centum of the air out of the system and it is drawn through a venturi scrubber and a separator by the exhaust fan (number 8). The removal of this air puts the whole system under suction and prevents a build-up of fine dust in the air-circulating system. The balance of the air is then conveyed by air ducting (number 9) and is returned to the mill, making it a completely closed system. Ore is fed into the mill at this point, indicated as number 10.

There are quite a few essential electrical elements or devices used with an Aerofall Mill. The main electrical elements are the synchronous motor which drives the mill and the two motors which drive the two fans illustrated on page 1 of exhibit 2. There are also other electrical devices used in the system, such as heaters for the oil, pressure switches, oil flow switches, the electronic feed controls presently in issue and so forth.

When asked to explain what the imported electronic feed controls actually are and how they are used in connection with the Aerofall Mills systems, witness Donnelly testified in substance as follows:

The electronic feed control is a device designed to suit a particular installation and it functions to keep an Aerofall Mill system operating at maximum efficiency. This is done by maintaining the load or charge in the Aerofall Mill at a constant level. He explained that there is a definite relation between the synchronous motor that drives the mill and the amount of ore or level of the charge in the Aerofall Mill. The electronic feed control is so designed that it obtains a signal of power drawn by the mill motor and compares this against a reference signal which has been set so that the mill will operate at a given load level. Any departure from this set, master, or reference signal is noted by the electronic feed control which, in turn, sends out a signal to the field of the d.c. generator. In effect, the signals coming from the electronic feed control stimu-

late a d.c. generator, and the generator, in turn, causes a motor which drives the feed belt to go faster or slower.

The imported feed controls are manufactured to precise specifications for an Aerofall Mill. Before the feed control can be built, it is necessary to know all the power characteristics of both the supply voltage and the Aerofall Mill system that is being used, as well as the feed arrangement which will be employed, whether there is to be a conveyer in connection with the feeders, and what their power consumption will be.

. The imported electronic feed control is an integral part of the operating mechanism of a particular Aerofall Mill. An Aerofall Mill will not operate efficiently without the electronic feed control, and, as a matter of fact, no Aerofall Mill is sold without a control. The mill could not be operated manually and obtain the efficiency in production that it can with an electronic feed control. The imported electronic feed control cannot be put to any practical commercial use other than in connection with an Aerofall Mill system.

Referring to the illustrations in evidence as exhibits 1A and 1B, Donnelly stated the approximate dimension of the product in question as 20 inches by 20 inches by 90 inches. He added that they are composed in chief value of metal.

On cross-examination, Donnelly testified that Milltronics, Ltd., manufactured and produced the imported electronic feed control devices here in issue. There is no relationship between that company and the Aerofall Mills, Inc., ultimate consignee herein other than that Milltronics, Ltd., builds the controls that are used with Aerofall Mills systems. The witness identified a brochure or pamphlet issued by Milltronics, Ltd., (received in evidence as defendant's exhibit A) illustrating electronic control systems and stated that the illustrations there depicted are similar to plaintiff's exhibits 1A and 1B.

Donnelly stated that an electronic feed control does not control the speed of the belt or the conveyor but that the control puts out a small pulsating voltage, which is applied to a d.c. generator, and changes the output of the generator. This variation of the output from the d.c. generator does change the speed of a motor, but actually the electronic feed control changes the generator voltage output.

On interrogation by the court as to the relative positions of the Aerofall Mill and the electronic feed control when said mechanisms are in operation, Donnelly stated that the electronic control does not have to be mounted close to the mill. Generally speaking, it is mounted in a control room where an operator has the instruments and control switches in his charge and is able to see the mill. The electronic feed control is equipped with dials or knobs which have positions on them and the various master controls are set to a cer-

tain number which, in effect, signifies a certain level of ore in the mill or a certain power drawn by the mill motor. There are also meters on the operator's control panel which indicate how the equipment is functioning. An electronic feed control is connected to a mill by wiring through a series of electrical components. An electronic feed control is not equipped with its own motor but has power leads going into it.

It is clear from the evidence of record in this case that the electronic feed controls in controversy are designed and used only with specific Aerofall Mills systems, are essential to their proper functioning, and are incapable of use for any other purpose. Consequently, it is our opinion that said articles constitute "parts" of an article, as that term has been judicially construed in the cases of *Peter J. Schweitzer* (*Inc.*) v. *United States*, 16 Ct. Cust. Appls. 285, T.D. 42872; *United States* v. *Willoughby Camera Stores, Inc.*, 21 C.C.P.A. (Customs) 322, T.D. 46851; and *United States* v. *Cody Manufacturing Co., Inc., Rohner Gehrig & Co., Inc.*, 44 C.C.P.A. (Customs) 67, C.A.D. 639.

It is likewise apparent from the record that the Aerofall Mills with which the electronic feed controls are used are articles having as an essential feature an electrical element or device. It follows therefrom that said feed controls are parts of an article having as an essential feature an electrical element or device within the purview of paragraph 353 of the tariff act, as modified, *supra*, as claimed by plaintiff.

Consideration must, of course, be given to whether the imported articles are more specifically provided for within other tariff provisions.

The electronic feed controls were classified by the collector of customs in paragraph 368(a) of the tariff act, as modified, *supra*, as mechanisms intended or suitable for regulating, indicating, or controlling the speed of arbors, drums, disks, or similar uses. The testimony of record discloses that the electronic feed controls in issue function to maintain the Aerofall Mills operation at maximum efficiency by maintaining the load or charge in the mills at a constant level. This end result is accomplished by electronic means whereby any under or overloading of a mill is adjusted by a signal to the d.c. generator which, in turn, causes the motor which drives the feed belt to go faster or slower. Although the electronic feed controls may indirectly accomplish a purpose analogous to mechanisms which regulate, indicate, or control the speed of arbors, drums, disks, or similar uses, it is our opinion that the articles in issue are not within the purview of such tariff provision for the reason that they do not directly perform any of the specified functions.

An alternative claim of plaintiff is that the imported articles are "Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy" in paragraph 353 of the tariff act, as modified, *supra*.

It is evident from the testimonial record that the instant feed controls may be said to rectify, modify, or control electrical energy in the performance of their function of controlling the generator voltage output. Plaintiff's claim for classification within the referred to provision of paragraph 353 appears to be well taken and would prevail if the imported articles are not elsewhere more specifically provided for.

A case referred to by plaintiff in its brief is of particular interest in a determination of the present controversy. In *United States* v. *Herman H. Sticht & Co.*, 22 C.C.P.A. (Customs) 40, T.D. 47048, our appellate court had before it for consideration the proper classification of certain indicators to be attached to the transmitter of a radiotelegraph apparatus to indicate to the operator the potential capacity of a transmitter in terms of words per minute, at the speed at which the transmitter was being operated at a given instant. The court there stated—

The Government insists that the devices fall within the descriptive terms of said paragraph 368, and that they are there more specifically described than in paragraph 353, and that they are therefore dutiable under the former paragraph. Assuming, without deciding, that the devices in question fall within the descriptive terms of said paragraph 368, nevertheless the wireless telegraph transmitters to which they are attached are *eo nomine* provided for in paragraph 353, either as "electrical telegraph" or as "radio" apparatus. We think the transmitting apparatus is properly defined by either term. The device in question is a part of an electrical telegraph apparatus, or a part of a radio apparatus, and we think that a "part" of such apparatus provided for in paragraph 353 is a more specific designation than the general descriptive language of a "mechanism, device, or instrument intended or suitable for * * * indicating * * * the speed of arbors, * * * or similar uses", found in paragraph 368.

The appellate court further stated—

It is true, as pointed out by the Government, that paragraph 353 contains the clause "not specially provided for", while paragraph 368 does not. However, it is well settled by this court that if an article is more specifically described in a paragraph containing the "not specially provided for" clause than in a paragraph not containing such clause, the presence of the clause in the one paragraph will not have the effect of excluding the article from the paragraph where it is more specifically provided for. *Knauth, Nachod & Kuhne* v. *United States*, 4 Ct. Cust. Appls. 58, T.D. 33307 ; *Loewenthal & Co.* v. *United States*, 6 Ct. Cust. Appls. 209, T.D. 35464; *Comstock & Theakston* v. *United States*, 12 Ct. Cust. Appls. 502, T.D. 40698.

By analogical reasoning, we are of the opinion that confronted as we are here with the relative specificity of the provision for "parts" of an article having as an essential feature an electrical element or device and the provision for "Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy,"

both contained in paragraph 353 of the Tariff Act of 1930, as modified, *supra*, the provision for parts of an article having as an essential feature an electrical element or device more specifically describes the instant electronic feed control.

Defendant, in its brief, cites the cases of *United States* v. *R. W. Cramer & Co.*, 21 C.C.P.A. (Customs) 379, T.D. 46911, and *United States* v. *R. W. Cramer & Co., Inc.*, 22 C.C.P.A. (Customs) 45, T.D. 47049. The issues in those cases are clearly distinguishable from the question here presented.

In the first *Cramer* case above cited certain electromechanic recorders were held dutiable within the provisions of paragraph 368 of the Tariff Act of 1922 for "any device or mechanism having an essential operating feature * * * for regulating or controlling the speed of arbors, drums, disks, or similar uses," rather than as machines, not specially provided for, in paragraph 372 of said act. The electromechanic recording devices there in issue were shown to be used for a variety of purposes in the recording of certain events, such as the number of times an elevator rises or descends in its shaft, or the number of times a railroad train or a streetcar passes a certain point. The electronic feed controls presently in issue are dedicated to a sole use in connection with the efficient operation of Aerofall Mills ore grinding systems.

In the second *Cramer* case, *supra*, electric automatic time switches and cases therefor were likewise shown to be articles dedicated to a variety of uses in that they automatically operated electric advertising signs, electric signals, electric airway beacons, electric thermostatic devices, and so forth. Their classification by the collector of customs as "any mechanism, device, or instrument, intended or suitable for * * * performing any operation or function at a predetermined time or times" was affirmed.

Defendant, in its brief, states that in the event the court concludes that the classification of the collector of customs cannot be upheld, "then the Government alternatively contends, without conceding the correctness and propriety of such a result, that the involved imported article should still be held to be properly dutiable under paragraph 368(a) as modified, *supra*, as 'any mechanisms, devices, or instruments intended or suitable for measuring * * * the flowage of * * * electricity, or *similar uses* * * *' [italics ours], it appearing by the proof (R. 50–51, and Defendant's Exhibit C for Identification) that said device is intended or suitable for measuring the flowage of electricity, or similar uses. *Ferranti, Ltd.* v. *United States*, 69 Treas. Dec. 609, T.D. 48242; *United States* v. *R. W. Cramer & Co., supra*."

In view of the evidence that the electronic feed controls in controversy are dedicated to use and form an essential part in the operation of Aerofall Mills systems, we are of opinion that they are properly

classifiable as parts of such articles rather than within the descriptive language of defendant's alternative claim.

Upon the record and for the foregoing reasons, we hold that the electronic feed controls before the court should properly be classified as parts of articles having as an essential feature an electrical element or device in paragraph 353 of the Tariff Act of 1930, as modified by the Torquay protocol to the general agreement, *supra*, and assessed with duty at the rate of 13¾ per centum ad valorem. That claim in the protest is, therefore, sustained. All other claims are overruled.

Judgment will issue accordingly.